# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT** | : | |
| **OPPORTUNITY COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION FILE NO.** |
| **KENDRICK JONES,** | : | |
| | : | **1:06-CV-2569-TWT/AJB** |
| **Intervenor-Plaintiff,** | : | |
| **v.** | : | |
| | : | |
| **FAMILY DOLLAR STORES** | : | |
| **OF GEORGIA, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

## ORDER FOR SERVICE OF
## <u>REPORT AND RECOMMENDATION</u>

Attached is the Report and Recommendation of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b), and N.D. Ga. R. 72.1(D)(2). Let the same be filed and a copy, with a copy of this order, be served upon counsel for the parties or, if a party is not represented, upon that party directly.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within ten (10) days of receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s)

AO 72A
(Rev.8/8
2)

made (including reference by page number to any transcripts if applicable) and shall be served upon the opposing party.  The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court.  If no objections are filed, the Report and Recommendation may be adopted as the opinion and order of the District Court and any appellate review of factual findings will be limited to a plain error review.  *United States v. Slay*, 714 F.2d 1093 (11th Cir. 1983).

The Clerk is directed to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this ___30th___ day of __July__, 2008.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT** | : | |
| **OPPORTUNITY COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION FILE NO.** |
| **KENDRICK JONES,** | : | |
| | : | **1:06-CV-2569-TWT/AJB** |
| **Intervenor-Plaintiff,** | : | |
| **v.** | : | |
| | : | |
| **FAMILY DOLLAR STORES** | : | |
| **OF GEORGIA, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Currently before the Court is Defendant's motion for summary judgment, [Doc. 72], including therein a request for attorney's fees and costs. [Docs. 72-1 at 2, 72-2 at 23]. For the reasons stated below, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED** on any federal claims asserted by Plaintiff and Intervenor-Plaintiff, but that Defendant's attorney's fees and costs request be **DENIED**. Also, *sua sponte*, the undersigned **RECOMMENDS** that Intervenor-Plaintiff's state law claim for intentional infliction of emotional distress be **DISMISSED WITHOUT PREJUDICE**.

**INTRODUCTION**

On October 24, 2006, Plaintiff Equal Employment Opportunity Commission ("the EEOC"), filed a civil action against Defendant Family Dollar Stores of Georgia, Inc. ("Family Dollar" or Defendant),[1] alleging sexual harassment and constructive discharge, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, ("Title VII"), and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a ("1981a").[2]  The complaint was based on allegations that a

---

[1]      On January 22, 2007, the EEOC moved to amend the complaint to correct Defendant's name from "Family Dollar Stores, Inc." to "Family Dollar Stores of Georgia, Inc."  [Doc. 6].  The motion was granted on March 16, 2007.  [Doc. 17].

[2]      Section 1981a is not an independent cause of action.

"Section § 1981a  does not create a new substantive right or cause of action.  Rather, the plain language of the statute shows that it merely provides an additional remedy for "unlawful intentional discrimination . . . prohibited under . . . 42 U.S.C. § 2000e-2 or 2000e-3."  42 U.S.C. § 1981a(1)(1).  Those sections of title VII, then, provide the underlying substantive right, a right that prohibits conduct only by "employers," "employment agencies," and "labor organizations." *See* 42 U.S.C. §§ 2000e-2, 2000e-3.

*Huckabay v. Moore*, 142 F.3d 233, 241 (5th Cir. 1998); *see also Pollard v. Wawa Food Market*, 366 F. Supp. 2d 247, 251-52 (E.D. Pa. 2005) ("[T]he great weight of authority holds that § 1981a does not create an independent cause of action, but only serves to expand the field of remedies for plaintiffs in Title VII suits.") (citing cases).  As a result, the Court analyzes this case solely under Title VII.

2

Family Dollar store manager, Michael Garrison ("Garrison"), sexually harassed Intervenor-Plaintiff Kendrick Jones ("Jones"), an employee at one of Defendant's stores.  [Doc. 1 at 1].  Family Dollar answered on December 22, 2006.  [Doc. 2].  The EEOC filed an amended complaint, [*see* Doc. 18], which Family Dollar answered. [Doc. 21].

On January 5, 2007, Jones moved to intervene as a party-plaintiff and filed a complaint asserting the same federal claims as the EEOC, as well as a state law claim for intentional infliction of emotional distress.  [Doc. 4].  The motion was granted on March 16, 2007.  [Doc. 16].  Defendant answered Jones's complaint on March 22, 2007.  [Doc. 22].

On November 20, 2007, Defendant moved for summary judgment.  [Doc. 72]. The EEOC and Jones responded on December 13, 2007.  [Docs. 81, 83].  Family Dollar replied to each on December 31, 2007.  [Docs. 91, 92].  With briefing concluded, the Court turns to the merits of the motion.

3

## *STATEMENT OF MATERIAL FACTS*

The following pertinent facts are construed at the summary judgment phase in the light most favorable to the EEOC and Jones as the non-moving parties[3]:

On May 16, 2004, Jones, along with his best friend, Darnell Lynn, applied for employment with Garrison, who at the time was the manager of Family Dollar Store # 728 in Atlanta, Georgia. (D[4] ¶ 1; P[5] ¶ 1; deposition of Kendrick Jones ("Jones Dep.") at 34-35; deposition of Darnell Lynn ("Lynn Dep.") at 22-23). Jones was seventeen

---

[3]    In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1085 (11th Cir. 2004) (citing *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999)).

[4]    Paragraph numbers preceded by "D" refer to paragraphs in the Defendant's "Statement of Undisputed Facts." [Doc. 72, Att. 2 (CM/ECF document 72-3)]. Paragraphs preceded by "P" refer to paragraphs in the EEOC's "Statement of Material Facts in Dispute." [Doc. 85]. Paragraphs preceded by "IP" refer to paragraphs in Jones's "Statement of Additional Facts which Present Genuine Issues for Trial." [Doc. 80].

[5]    Defendant correctly points out in its response to EEOC's statement of material facts, [Doc. 89 at 1, *et seq.*], that the EEOC's statement of disputed facts does not comply with N.D. Ga. R. 56.1(B)(2), which requires that each alleged material fact be numbered separately. Although the Court would be authorized to disregard the EEOC's facts on this basis, the Court will exercise its discretion and consider them. *See Harris v. Fulton-DeKalb Hospital Authority*, 255 F. Supp. 2d 1347, 1362 n.1 (N.D. Ga. 2002) (noting that plaintiff failed to comply with Rule 56.1(B)(2), but considering document in order to ascertain relevant facts in the record).

(17) years old at the time. (P ¶ 2; IP[6] ¶ 1; Jones Dep. at 17, 94). Garrison interviewed

Jones and Lynn, gave them a tour of the store, and offered them jobs as stockers on a

part-time basis. (D ¶ 1; P ¶ 6; Jones Dep. at. 37-39; Lynn Dep. at 23-24). During the

interview and tour of the store, Garrison did not say anything inappropriate to Jones,

who at that time felt comfortable working with Garrison. (D ¶ 3; Jones Dep. at 40).

Jones and Lynn accepted the job offers and worked approximately two hours that day.

(P ¶ 17; Jones Dep. at 39). However, Jones and Lynn did not appear on the Family

Dollar time sheets until May 20, 2004. (Jones Dep. at 47, Exh. 4).

---

[6]     In response to Family Dollar's statement of material facts, the EEOC filed a response to this statement, but Jones did not, contrary to his obligations under N.D. Ga. R. 56.1B(2)(a) ("A respondent to a summary judgment motion *shall* include . . . a response to the movant's statement of undisputed facts.") (emphasis added). [*See* Dkt. following entries dated 11/20/ 2007]. As a result of Jones's failure, the Court accepts the facts contained in Defendant's statement of material facts as true as they relate to Jones, to the extent they otherwise are supported by the evidence, do not make credibility determinations, and are not legal conclusions. N.D. Ga. R. 56.1(B)(2)(a)(2) (deeming undisputed facts admitted); *see also Cockrell v. Sparks*, 510 F.3d 1307, 1310 n.2 (11th Cir. 2007) (deeming material facts set forth in defendants' statements of uncontested facts to be admitted, as plaintiff failed to contest them); *Garland v. Advanced Medical Fund, L.P., II*, 86 F. Supp. 2d 1195, 1200 (N.D. Ga. 2000) (where respondent to summary judgment motion failed to specifically controvert moving party's factual statements, deeming admitted "those of [movant's] factual statements that do not constitute legal conclusions and are properly supported by the record").

Garrison did not provide Jones or Lynn with any company manuals or policies, including Family Dollar's anti-sexual harassment policy, nor did he verbally advise them of the company's policies and procedures. (P ¶ 7; Jones Dep. at 41-42; Lynn Dep. at 54-55). At no point during his employment did anyone talk to Jones about Family Dollar's harassment policy, nor did Jones see a written version of it. (P ¶ 7; Jones Dep. at 42-43). Also, Jones never saw a poster with Family Dollar's hotline number. (P ¶ 7; Jones Dep. at 145; Lynn Dep. at 47). However, Lynn saw a poster with a hotline number on the wall behind the door to Garrison's office. (P ¶ 7; Lynn Dep. at 47-48, 60-61). Employees could not enter Garrison's office without permission. (Lynn Dep. at 60).

The mostly male workforce at Family Dollar generally joked and engaged in horseplay, except for Jones, who was too much of a "goody-two shoes." (D ¶ 21; Lynn Dep. at 29-31, 45). Garrison made jokes about everyone who worked at the store, including the female employees. (D ¶ 21; Lynn Dep. at 31). Jones did not see Garrison having a problem working with males, since, in part, he only had males working on his shift. (D ¶ 21; Jones Dep. at 149-50). Garrison gave nicknames to "pretty much" everyone who worked in the store, including females. (Jones Dep. at 149). Garrison also tried to make jokes about "about everybody or anybody." (Lynn Dep. at 29-31).

6

At the time he worked for Family Dollar, Jones was shorter than Lynn and had a skinny build. (P ¶ 10; Lynn Dep. at 42). He also was shy and quiet. (*Id.*). While working at Family Dollar, Jones's appearance always was presentable. (P ¶ 11; IP ¶ 20; Jones Dep. at 71). His hair was cut, his pants had creases in them, and his shirt always was tucked in. (*Id.*). None of the other employees tucked in their shirts. (*Id.*).

Jones admits that Garrison never told him that he was not sufficiently manly, had female mannerisms, acted liked a woman, or had a feminine voice. (D ¶ 22; Jones Dep. at 129, 151). Additionally, Garrison never propositioned him for sex or asked him on a date. (D ¶ 19; Jones Dep. at 149). Jones is not homosexual. (P ¶ 8; Jones Dep. at 132).

Jones and Lynn worked approximately 18 hours their first week, but Garrison paid them for 30 hours to help make sure they received more money in their first paycheck. (D ¶ 4; P ¶ 27; Jones Dep. at 54-56; Lynn Dep. at 25-26). One time during their first week of employment, Jones and Lynn were stocking shelves. (D ¶ 20; Jones Dep. at 50). Lynn was stocking items on the top shelf, while Jones, who was on his knees, was stocking items on the bottom shelf. (*Id.*). Garrison came around the corner and stated that Jones and Lynn must be the rap group "the Ying Yang Twins." (*Id.*) Garrison also asked Jones why he was on his knees. (*Id.*; Lynn Dep. at 28). Jones did

7

AO 72A
(Rev.8/8
2)

not consider the Ying Yang remark to be a comment on his sexuality.  (Jones Dep. at 51).  Garrison further stated that Jones looked like the "type of person who would build a bomb in [his] own room."  (D ¶ 3; P ¶ 17; Jones Dep. at 51).

During his second week of employment, Jones worked only 13 hours because of his high school graduation.  (Jones Dep. at 54).  He did not recall a problem working with Garrison during this second week of employment.  (D ¶ 5; Jones Dep. at 56).

On June 1, 2004, Lynn informed Jones that Garrison made a comment that Jones was gay or liked boys.  (D ¶ 6; P ¶ 29; Jones Dep. at 63-64, 66).  Jones did not hear Garrison make the statement, but learned about the statement from Lynn.  (D ¶ 6; Jones Dep. at 64-65).

Jones testified that he could not recall all of the remarks made by Garrison, only those that were "truly embarrassing," "that stand out" or were "important."  (Jones Dep. at 91-92, 116).  Jones and Lynn reported the statements Garrison made to them about Jones to Jones's mother when she picked them up from work.  (Jones Dep. at 100-01).  At his mother's suggestion, Jones kept a diary/ journal about these comments.  (*Id.* at 95-96).  In explaining the entries Jones made in the diary, Jones testified that:

> I was referring to the comments that was [*sic*] made on the job.
> I mean, at that time, I couldn't focus on my job duties because twice a
> day, every time I worked, it was something being said about me.  There

8

> were rumors around the store, you know, about things that was said about
> me. . . I mean, it was just harassment on the job period.

(*Id.* at 96).

Jones stated in his EEOC charge that "Garrison repeatedly [told] my coworkers that I liked boys and that I was gay." (Jones Dep. at 120 & Exh. 7). However, Jones only remembers Garrison making three comments directly to him or in his presence. (D ¶ 8; Jones Dep. at 92). On one occasion while Jones was working the register, two female customers came into the store and asked Garrison why he did not have any female workers in the store. (D ¶ 9; P ¶ 30; Jones Dep. at 85-86). Garrison laughed, pointed to Jones, and said that Jones was "half-female." (*Id.*) Jones did not say anything to Garrison and finished his shift. (D ¶ 9; Jones Dep. at 86).

On June 6, Jones heard Garrison yell across the store "where is Kendrick's bitch ass?" (D ¶ 10; P ¶ 31; IP ¶ 10; Jones Dep. at 88, 143). When Jones responded to Garrison's call for him, he learned that Garrison wanted him to unpack some boxes. (D ¶ 10; Jones Dep. at 89). Jones continued working the remainder of that day without complaint or raising any objections to Garrison's statement. (D ¶ 10; Jones Dep. at 89-90).

9

Also, while Garrison, Lynn and Jones were in an aisle of the store, Garrison stated to Lynn that "Kendrick don't get pussy, but he do get some ass." (D ¶ 11; P ¶ 33; Jones Dep. at 67, 90). Lynn also heard this comment. (P ¶ 33; Lynn Dep. at 39-40). Jones responded, "I ain't gay." (P ¶ 33; Jones Dep. at 68, 70). Garrison smirked in response, and Jones walked off. (*Id.*).

Other comments were made outside of Jones's presence and he only learned of the comments from other employees. (D ¶ 8; Jones Dep. at 92). He stated in his EEOC charge that " 'Garrison stated to coworkers that Kendrick is gay and he likes boy's penis [*sic*],' " (Jones Dep. at 120 & Exh. 7), but Jones did not remember to whom that statement was made or who told him about it. (Jones Dep. at 120). Jones also testified that, on an unspecified date, Garrison told Lynn (who in turn told Jones) that "Kendrick is gay and that he, Garrison, was going to fire Kendrick because he does not like him." (*Id.* & Exh. 7).

At his deposition, Jones testified that Lynn heard Garrison make several comments regarding Jones. On one occasion, when Jones and Lynn were stocking in the feminine products aisle, Garrison commented to Jones, "Oh, you like sticking stuff up your butt, don't you," and "Oh now you are using tampons." (P ¶ 21; IP ¶¶ 13-14;

10

Lynn Dep. at 27).  Lynn testified that both he and Jones "laughed it off."  (Lynn Dep. at 28-29).

According to Lynn, Garrison also stated to Jones, "Oh, you like being on your knees," one day while he and Lynn were stocking trash bags and Jones was working on his knees.  (IP ¶ 15; Lynn Dep. at 28).  Garrison also asked Lynn, "[W]hy Kendrick walk like that," (P ¶ 22; IP ¶ 17; Lynn Dep. at 32), and whether Jones had a girlfriend, whether Jones hung out with guys, and what type of stores Jones liked going to. (P ¶ 22; Lynn Dep. at 33).  Lynn also overhead Garrison asking the Assistant Manager, Joey Elliot, whether he thought Jones was gay.  (P ¶ 24; Lynn Dep. at 34).  Lynn thought that Garrison was asking the questions because he was trying to figure out whether Jones was homosexual.  (P ¶ 23; Lynn Dep. at 33).  Lynn never heard Garrison question whether any of the other employees were homosexual.  (P ¶ 23; Lynn Dep. at 44).

On June 10, 2004, Jones confronted Garrison directly about the comments he was making.  (P ¶ 34; IP ¶ 22; Jones Dep. at 114-15, 140-41).  He asked Garrison to stop using gay comments about him.  (Jones Dep. at 140).  Garrison "just started grinning about it, telling me, man, come on, just chill out[.]" . . .  He just putting his arm like, you know, stop being, you know, stop being so serious or something like

11

that." (*Id*. at 141). Jones thought that as a result of his confronting Garrison that Garrison was going to stop making comments about him. (*Id*). However, within a "day or so," Garrison started "with his same old childish acts," by which Jones meant Garrison's comments. (P ¶ 39; IP ¶ 23; Jones Dep. at 141-42).

Around that same time, Jones's mother, Delphina Brooks, spoke with Garrison when she dropped Jones and Lynn off for work. (P ¶ 37; deposition of Delphina Brooks ("Brooks Dep.") at 51). She asked Garrison to stop the comments and jokes. (*Id*.). Garrison told Brooks that Jones was quiet, kind of like how he [Garrison] was when he was younger. (*Id*.). He also stated that he was "just trying to build [Jones] up." (P ¶ 37; IP ¶ 6; Brooks Dep. at 40, 47).[7]

Around June 16, 2004, Garrison confiscated Jones's cell phone, stating that Jones was not allowed to have a cell phone with him on the floor. (P ¶ 40; Jones Dep. at 72). As Jones was getting ready to leave work, Elliott told Jones that a girl named Mia had called his cell phone and that Jones had better call her back because "you know how [Garrison] try to make it seem like you're gay." (P ¶ 40; Jones Dep. at 73). Jones got his phone from Garrison, and called his friend, Sujmil "Mia" Smith ("Smith"). (P ¶ 40;

---

[7]     Before Jones and Lynn complained to Brooks about Garrison's comments, she delivered to Garrison a plate of food. (Brooks Dep. at 49).

12

Jones Dep. at 73-74).  Smith was irate, and demanded to know who had been using Jones's phone.  (P ¶ 40; Jones Dep. at 74).  Jones told Smith it was Garrison.  (D ¶ 25; P ¶ 40; Deposition of Mia Smith ("Smith Dep.") at 24).  According to Smith, when Garrison answered, before she could say anything, he said, "When can I hit it from the back."  (P ¶ 40; Smith Dep. at 28-29).  Smith asked where Jones was, and Garrison said, "[I]f you don't have a penis, don't call anymore.  So go get some surgery and call back when you have a wee-wee."  (P ¶ 40; Smith Dep. at 28).  Smith then asked, "Who is this," to which Garrison replied, "Kendrick likes boys.  Call back and leave a message."  (D ¶ 13; P ¶ 40; Smith Dep. at 28-29).  After speaking with Smith, Jones called the store to speak with Garrison, but Elliott told him that Garrison had left for the day.  (P ¶ 4; Jones Dep. at 78).

After he finished his shift, Jones told his mother about the phone call incident between Smith and Garrison.  (D ¶ 14; P ¶ 44; Jones Dep. at 82).  Brooks called Garrison that night and cursed him out.  (D ¶ 14; P ¶ 44; Brooks Dep. at 41-44).[8]

---

[8]     Brooks testified that she told Garrison:

In so many words, I told him, you don't have no business taking Kendrick's damn phone, you don't pay for his telephone bills, so you don't have no business taking it.  I said, you sit here, you keep harassing him, telling him he's this and he's that, you don't have the right.  I said, you're not his fucking father, so you don't have that right.  His own damn

13

Garrison responded, "I don't have a breast for Kendrick to suck on." (P ¶ 44; IP ¶ 5; Brooks Dep. at 44; *see also* Jones Dep. at 99).[9]  She then hung up on him. (Brooks Dep. at 44).

After she got off the phone, Brooks and Jones decided that they needed to take action against Garrison. (P ¶ 46; Brooks Dep. at 57).  Since Jones was unaware either of a number specifically for reporting harassment or a person to whom to report harassment, Brooks told Jones to get out the phone book. (P ¶ 46; Jones Dep. at 45, 145; Brooks Dep. at 57).  Brooks found a 1-800 number in the phone book and a left a message that night. (D ¶ 15; P ¶ 46; Brooks Dep. at 57-58).  No one from Family Dollar called back. (*Id*.).[10]

---

dad don't talk to him like that, so what give you the right to talk to him like that.  I said, Kendrick came there to work.  He didn't come there for you to harass him.  He came there to work.

(Brooks Dep. at 42-43).

[9]    Jones testified that his mother also reported to him that Garrison stated that Jones "ain't man enough" and needed "to quit being a wimp." (Jones Dep. at 113).

[10]    Brooks and Jones placed a second call to Family Dollar on June 23, 2004. (D ¶ 15; Jones Dep. 44-45).  However, the record does not reflect what, if anything, occurred during or following that phone call.

14

Jones worked one more day - - on June 17, 2004 - - after the Garrison-Smith phone call incident. (P ¶ 47; Jones Dep. at 80-81, 109). He did not confront Garrison about the phone call involving Smith. (Jones Dep. at 81).

On that date, while the employees were gathered for Garrison to assign the day's stocking tasks, Garrison pointed to Jones and an openly homosexual employee, Maurice, called them "Sugar Free,"[11] and directed them to meet him in the back of the store. (P ¶ 49; Jones Dep. at 106-07, 110-11, 154). While Jones and Maurice were stocking, Maurice said to Jones, "Dang, man, Michael [Garrison] be talking about you like a dog." (P ¶ 49; Jones Dep. at 82). Maurice also told Jones that Garrison had answered Jones's phone the previous day and that he (Maurice) had heard the conversation. (P ¶ 49; Jones Dep. at 83, 112).

———————————

[11]     The EEOC, without citation, defines "sugar free" as "slang for a term of irony used to refer to gay males who are considered 'sweet.' " [Doc. 83 at 10 n.12]. On the other hand, Urban Dictionary defines the term as meaning "[w]ithout a significant other. Applies in both the short term and the long term. After a break-up, one is sugar free until they find another. One can also be deemed sugar free if they are out without their boyfriend/girlfriend for the evening. *Though acceptable in use by both genders, a male's usage would generally cause him to be considered gay*." *See* Urban Dictionary website, located at http://www.urbandictionary.com/define.php?term=sugar+free (last visited July 22, 2008).

AO 72A
(Rev.8/8
2)

On June 23, 2004, Jones returned to Family Dollar Store # 728 and handed Garrison his letter of resignation.  (P ¶ 55; Jones Dep. at 11-13).  According to Jones, he felt forced to quit because Garrison was not going to stop making comments "unless I just left."  (P ¶ 54; Jones Dep. at 153).  He testified as follows:

> I mean, it wasn't easy always going to work like holding my head down trying to work, but I know that at that time that, you know, I needed some money in college, I needed to save up, because I'm ready to start school, start college.  So I was just trying my best to save up money because I knew I had to pay for books and stuff like that later on.  And the basis for me suing is because I had to work under these conditions like - - I mean it don't seem long, but it seemed long to me.

Jones Dep. at 124-25.[12]  He thought that Garrison probably wanted him to quit and Lynn told Jones that Garrison had said that he wanted Jones to quit.  (P ¶ 54; Jones

_____

[12]     Jones also testified:

> . . . I told you all that it was hurtful, you know, and I told you that I was stressed out and always had to worry about what he was going to say [to] me next.  And I told you how he embarrassed me in front of customers, and I gave you an example of how it was embarrassing, you know, pointed to me, told me I was a female.
>
>      I mean, like I say, I just had to keep worrying every time I came to work, I always had to worry about what he was going to say to me next or what was going to be said about me next.

(Jones Dep. at 168).

16

Dep. at 157).[13]  Jones himself never heard Garrison say that he wanted to fire Jones or that he wanted Jones to quit.  (D ¶ 23; Jones Dep. at 157).

In late July or early August 2004, Family Dollar Regional Loss Prevention Director Sean Ross investigated Jones's allegations of harassment, after receiving notice of the allegations from Jones's counsel.  (D ¶ 17; P ¶ 58; deposition of Sean Ross ("Ross Dep.") at 34, 59, 61-63).  Based on interviews with Garrison, Liz Lawrence, Jason Pitts, and Samuel Bryant, Ross concluded that there was nothing to Jones's allegations.  (D ¶ 18; P ¶ 58; Ross Dep.  at 67, 74, 78, 81).  However, Ross did not interview Jones or Lynn.  (P ¶ 58; Ross Dep. at 65, 74-76).

On December 12, 2004, Jones filed a charge of discrimination with the EEOC.  (P ¶ 61; Jones Dep. at 119, Exh. 7).  After investigating the charge, (*see generally* deposition of Natasha Lee Sears), the EEOC brought the present lawsuit.

### *SUMMARY JUDGMENT STANDARD*

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The movant carries the initial burden of "informing the court of the basis for its

---

[13]    At the same time, however, Jones testified that Garrison sometimes told him he did a good job, (Jones Dep. at 154), and gave him brochures or books on management.  (*Id.* at 154, 158).

17

motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 840 (11th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

The nonmovant is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* If the record does not blatantly contradict the nonmovant's version of events, the court must determine

18

"whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *See Anderson*, 477 U.S. at 252; *see also EPL Inc. v. USA Federal Credit Union*, 173 F.3d 1356, 1362 (11th Cir. 1999); *Duke v. Cleland*, 884 F. Supp. 511, 514 (N.D. Ga. 1995). Summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### CONTENTIONS OF THE PARTIES

In its initial brief, Family Dollar contends that the EEOC and Jones cannot establish a *prima facie* case of sexual harassment hostile work environment. It argues that they cannot show that he was harassed "because of sex" since they have not shown that Garrison either had a homosexual or bisexual desire for Jones or that he harbored a general hostility to men in the workplace. [Doc. 72-2 at 6, 9]. Moreover, it argues that most, if not all, of Garrison's comments targeted Jones's perceived sexual orientation, which is not actionable. [*Id.* at 9-11]. It also argues that there is insufficient evidence to establish a harassment claim based on gender stereotypes. [*Id.* at 11-13].

19

Family Dollar next argues that Garrison's conduct did not constitute actionable harassment because the three allegedly offensive comments Jones stated were made to him (telling Lynn that "Kendrick don't get pussy, but he do get some ass"; telling two customers that he was half-female; and asking "[w]here is Kendrick's bitch[14] ass?") were insufficiently severe and pervasive to constitute harassment based on sex. Also, Defendant contends that the comments to others (telling Lynn repeatedly that Jones was gay and liked boys; telling an unidentified coworker that Jones was gay and likes boy's penis; and answering Jones's cell phone when Mia Smith called it and telling her that Jones did not like girls and she should call back after she got a penis) were not made comments based on gender stereotypes but rather perceived sexual orientation, and that, in any event, they were not made in his presence and were not otherwise sufficiently severe or pervasive to constitute a hostile work environment.

Next, Defendant argues that the evidence is insufficient as a matter of law to satisfy the "high threshold" of a constructive discharge claim.

Finally, Defendant seeks attorney's fees and costs on the grounds that the EEOC's claims are based on legal theories long-since rejected and are frivolous.

_____

[14]     Family Dollar also contends that the word "bitch" is not sexual in nature. [Doc. 72-2 at 17, n.5].

20

Jones responds that a material fact question exists as to whether Garrison engaged in unlawful gender stereotyping. He contends that Garrison's statements (to the female customers) that Jones was "half-female"; (to Brooks) that he did not have a breast for Jones to suck; asking "[w]here's Kendrick's bitch ass"; and questioning Lynn as to why "Kendrick walk like that," were negative suggestions that Jones's masculinity was lacking. [Doc. 81 at 3]. As to the statements made to others about him, Jones argues:

> Kendrick who was 17 at the time of the comments, is not gay, but was perceived and accused by his supervisor as appearing gay or effeminate. Specifically, Garrison once asked Lynn, "*why does Kendrick walk like that*[?]" According to Lynn, Garrison called Kendrick gay because of the way he [Kendrick] looked [because] he looked like a pretty boy type[15]; Garrison once answered Kendrick's cell phone and told a

---

15    Although Jones does not provide a record citation for this statement, Lynn testified in his deposition as follows:

Q.    Would people laugh at [Garrison's] jokes?

A.    Yes, they laugh at them. That was the only thing he tried to do is get a laugh out of somebody. Some of the stuff he said wasn't even called for.

Q.    Like what?

A.    Like when he be trying to call Kendrick gay because of the way he looked because he looked like a pretty boy type. And he asked me why Kendrick walk like that. I said I don't know, I don't even look

21

female friend of Kendrick's, "*If you don't have a penis, don't call anymore . . . so get some surgery and call when you have a wee-wee*"; Garrison also told her that "*Kendrick likes boys.*" Garrison also made the statement that Kendrick never had pussy.

In the warped mind of Garrison, Kendrick did not meet this expectations of a stereotypical heterosexual male. A heterosexual man should, in Garrison's words, "*get pussy.*" A heterosexual male should not walk the way Kendrick walked. A masculine heterosexual male should not be clean cut, shirt tucked-in, pants creased and neat. Garrison explained to Kendrick's mother that by riding Kendrick constantly and calling him less than a man that he [Garrison] was trying to build Kendrick up. The truth is instead of building up this black teenage male, who was planning to attend college to become a teacher, Garrison berated and degraded him constantly with insults directed toward his manhood.

[Doc. 81 at 3-4] (emphasis in original).

Jones also contends that Family Dollar's attempt to characterize Garrison's conduct as based on perceived sexual orientation, which is not actionable, rather than gender stereotyping, which is, should be rejected. He argues that Garrison's questioning of Lynn as to why Jones "walked like that," mocking him for not having sex and calling him a "half-female," among other comments, satisfied the unlawful practice of gender stereotyping. [*Id.* at 5-8].

---

at no other man like that, another boy.

(Lynn Dep. at 32).

With regard to his claim of hostile work environment, Jones argues that the abuse was both objectively and subjectively offensive.

The EEOC contends that material fact questions exist as to both of its claims. First, regarding the hostile work environment claim, the EEOC argues that a fact question remains as to whether Garrison was sexually attracted to Jones. It notes that "because no party was able to locate Garrison and question him about his sexual preferences, no one knows whether Garrison is homosexual or bi-sexual." [Doc. 83 at 19]. It further claims that the evidence "strongly suggests" that Garrison was sexually attracted to Jones based on (1) Garrison's living with Joseph Elliot, another Family Dollar employee; (2) Garrison's apparent "obsession" with Jones, in that he constantly talked and asked about him and followed him in the store; (3) Garrison separated Lynn and Jones by scheduling their work at different times, and Lynn observed Garrison place his arm around Jones; (4) Garrison always asked about Jones's sexuality and made comments to him to gauge his reaction; (5) Garrison's "vicious sex-based tirade" against Mia Smith when she called Jones's cell phone; and (6) Lynn and Smith concluded that Garrison was attracted to Jones and was trying to figure out if Jones was homosexual. [*Id.* at 20-21].

23

Alternatively, the EEOC argues that Garrison's conduct was based on unlawful gender stereotyping, contending that Garrison did not view Jones as sufficiently manly. In support, it argues that on multiple occasions, Garrison referred to Jones as a female ("half-female," using tampons) or implied his femininity/lack of masculinity (referring to Jones as a "bitch-ass," asking about the way Jones walked).

The EEOC next argues that the harassment suffered by Jones was severe and pervasive. It contends that the comments made directly to Jones in addition to those made outside his presence demonstrate that Garrison's conduct was objectively severe. In addition, it argues that it the following circumstances render Garrison's harassment severe: (1) Jones was only 17 years old at the time; (2) the "snide remarks of a sexual nature to, and about Jones" were made during the first week of employment, [*id.* at 28]; (3) the harassment continued everyday, sometimes twice a day; (4) Jones recalled four specific comments (why was he on his knees, "Kendrick don't get pussy, but he do get ass," the "half-female" comments to female customers, and yelling across the store, "where is Kendrick's bitch-ass."[16] The EEOC also asserts that severity is demonstrated

---

[16]    The EEOC also states that "[a]nother particularly offensive comment, *which Jones was able to put out of his mind*, was Garrison's statement to Jones, made in front of Lynn while Jones was stocking tampons, that Jones like sticking stuff (apparently tampons) up his butt." (citing Lynn Dep. at 27). [Doc. 83 at 29] (emphasis supplied). There is no evidence that Jones either heard that comment or that he "was

24

by the fact that during the first week of work, Lynn told Jones that Garrison stated that Jones was gay or liked boys, and during his last week of work, Jones was made aware of Garrison's lewd and offensive comments to Smith and Maurice told Jones that Garrison was treating him like a dog.  It also points to Garrison's failure to stop the mistreatment even when told to do so by Jones's mother.  Finally, the EEOC argues that the fact that the abuse came from Jones's supervisor, with the authority to fire him immediately, exacerbated the severity of the hostile environment.

As for the constructive discharge claim, the EEOC argues that Garrison's abuse imposed conditions so intolerable that a reasonable person in Jones's position would have been compelled to resign.  It asserts that Jones "had no choice but to resign." [*Id.* at 34].  After recounting the allegations of abuse, and the effect it had on Jones, the EEOC contends further that since Garrison never advised Jones of the anti-harassment policy and Brooks never received a call back after dialing the 1-800 number, Jones's only option was to resign.

Family Dollar responds that the evidence proffered by the EEOC that Garrison was homosexual or bisexual was only speculative, and that its contentions that Garrison

──────────────────

able to put it out of his mind," so the EEOC is not entitled to a favorable inference that Jones heard this comment.

25

targeted Jones for harassment demonstrate that Garrison's comments were directed at Jones's real or perceived sexual orientation and not his failure to conform with masculine stereotypes. [Doc. 91 at 2, 3-11]. It also argues that, standing alone, Jones's age does not satisfy the severe and pervasive prong of a hostile work environment. [*Id.* at 11-12]. Next, it contends that since sexual orientation is not protected by Title VII, the EEOC cannot rely upon those comments directed at Jones's real or perceived sexual orientation in arguing that the harassment was severe or pervasive. As such, only three arguably offensive comments made directly to Jones, together with comments not made in his presence but reported to him, go into the "severe and pervasive" calculation. It argues that the comments not made directly at Jones are accorded less severity, and that all together, the comments do not satisfy the severe and pervasive requirements. [*Id.* at 12-14]. Finally, Defendant argues that the EEOC has not met its burden of showing constructive discharge, since, aside form the non-severity of the harassment, any harassment was short-lived and Jones did not give Family Dollar an adequate opportunity to rectify any abuse. [*Id.* at 14-15].

Similarly, Family Dollar argues that Jones has not established that any comments were directed at him "because of . . . sex." It claims there was no testimony by Jones that Garrison claimed he "liked sticking stuff up his butt, specifically referring to

26

tampons." [Doc. 92 at 3]. It also disputes that the term "bitch ass" has any sexual connotation. It further contends that Jones cannot attribute the Mia Smith phone call to Garrison, and in any event, the statements do not relate to gender stereotyping. [*Id.* at 3-4]. It also argues that Garrison's comment to Brooks, that he did not have a breast for Jones to suck on, was not comment about his manliness, but that he refused to treat Jones like an infant. [*Id.* at 4]. Similar to its response to the EEOC's brief, Family Dollar submits that Jones's claims of harassment were neither severe or pervasive. [*Id.* at 4-9].

Finally, Family Dollar argues that Jones failed to respond to its arguments concerning constructive discharge, and therefore, his claim should be deemed abandoned, but that even if it had been addressed, summary judgment on that claim is warranted. [*Id.* at 9-10].

### DISCUSSION

### I.    Statutory Framework

The EEOC and Jones's complaints assert claims of sexual harassment and constructive discharge in violation of Title VII. Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race,

AO 72A
(Rev.8/8
2)

color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Although Title VII makes no express reference to sexual harassment, the courts have long recognized that the statutory language, "terms, conditions, or privileges of employment," includes within its scope a discriminatorily hostile or abusive environment. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999) (*en banc*) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993), and *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986)).

## II.  *Hostile Work Environment Based on Sexual Harassment*

Defendant first contends that neither the EEOC or Jones can establish a *prima facie* case of a Title VII hostile work environment based on sexual harassment. [*See* Doc. 72-2 at 4-19].  As a result, the Court examines whether genuine issues of material fact exist concerning the EEOC's and Jones's ability to establish a *prima facie* case of sexual harassment hostile work environment under Title VII.

### A.  *Prima Facie Case*

To establish a *prima facie* case of a hostile work environment based on sexual harassment, a plaintiff must show:

> (1) that []he belongs to a protected group; (2) that []he has been subject to unwelcome sexual harassment; (3) that the harassment was based on [his] sex; (4) that the harassment "was sufficiently severe or pervasive to alter

28

the terms and conditions of employment and create a discriminatorily abusive working environment"; and (5) a basis for holding the employer liable.

*Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1257 (11th Cir. 2003) (quoting *Mendoza*, 195 F.3d at 1245).

Defendant implicitly concedes that the EEOC and Jones can establish the membership in a protected group, unwelcomeness and employer liability elements of the *prima facie* case.  [*See* Doc. 72-2 at 6, 13 (arguing that Jones was not harassed because of his gender and that any conduct was not severe or pervasive)].  As a result, the Court only addresses (1) whether any harassment was based on Jones's sex; and (2) whether the conduct was sufficiently severe or pervasive to alter the terms and conditions of his employment with Defendant, thereby creating a discriminatorily abusive working environment.

### 1. Same-Sex Sexual Harassment

Title VII does not prohibit discrimination based on sexual orientation.  *See Blum v. Gulf Oil Corp.*, 597 F.2d 936, 938 (5th Cir. 1979) (noting that discharge on the basis of an employee's homosexuality is not prohibited by Title VII)[17]; *see also Vickers v.*

---

[17]       In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

29

*Fairfield Med. Ctr.*, 453 F.3d 757, 762 (6th Cir. 2006) ("[S]exual orientation is not a prohibited basis for discriminatory acts under Title VII."); *Simonton v. Runyon*, 232 F.3d 33, 35 (2d Cir. 2000); *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1084-85 (7th Cir. 2000) (holding that "harassment based solely upon a person's sexual preference or orientation (and not on one's sex) is not an unlawful employment practice under Title VII") (citing *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir. 1984)). However, in *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998), the United States Supreme Court held that "sex discrimination consisting of same sex sexual harassment is actionable under Title VII." *Id.* at 82.  In construing Title VII's prohibition of discrimination "because of . . . sex," the Court observed that:

> Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex.

*Id.* at 80.  While the Court noted that the same assumptions may not as readily be made in the same-sex harassment context, *id.*; *Davis v. Coastal Int'l Security, Inc.*, 275 F.3d 1119, 1123 (D.C. Cir. 2002), it explained that the statutory language and its precedents did not exclude same-sex harassment claims from Title VII's coverage, and that sexual harassment extended to any kind that met the statutory requirements.  *Oncale,*

30

523 U.S. at 80. The Court then identified three "evidentiary routes" under which a

plaintiff could show same-sex sexual harassment:

> The same chain of inference would be available to a plaintiff alleging same-sex harassment, if there were credible evidence that the harasser was homosexual. But harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex. A trier of fact might reasonably find such discrimination, for example, if a [male] victim is harassed in such sex-specific and derogatory terms by another [man] as to make it clear that the harasser is motivated by general hostility to the presence of [men] in the workplace. A same-sex harassment plaintiff may also, of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace. Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constitute "discrimina[tion] . . . because of . . . sex."

31

*Oncale*, 523 U.S. at 80-81 (internal citations omitted).[18]  Thus, in order to show same-sex sexual harassment, the EEOC or Jones must show either that (1) Garrison had a sexual desire for Jones; (2) Garrison had a general hostility towards men in the workplace; or (3) Garrison treated members of both sexes differently in the workplace. *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 262 (3d Cir. 2001); *Budenz v. Sprint Spectrum, L.P.*, 230 F. Supp. 2d 1262, 1273 (D. Kan. 2002); *Mowery v. Escambia County Utilities Authority*, No. 3:04-cv-382-RS-EMT, 2006 WL 327965, at * 3 (N.D. Fla. Feb. 10. 2006).  Neither the EEOC or Jones offer any evidence to

---

[18]    *See also Llampalles v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1246 (11th Cir. 1998), in which the court explained:

> [T]he act of sexual harassment itself creates an inference that the harasser harbors a sexually discriminatory animus towards the plaintiff.  When a person "sexually harasses" another, i.e., makes comments or advances of an erotic or sexual nature, we infer that "the harasser [is making] advances towards the victim because the victim is a member of the gender the harasser prefers." *Fredette v. BVP Management Assocs.*, 112 F.3d 1503, 1505 (11th Cir. 1997)[ ].  Unless there is evidence to the contrary, therefore, we also infer that the harasser treats members of the "non-preferred" gender differently - and thus that the harasser harbors an impermissible discriminatory animus towards persons of the preferred gender. *See Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982) ("In the typical case in which a male supervisor makes sexual overtures to a female worker, it is obvious that the supervisor did not treat male employees in a similar fashion.").  This inference can be drawn regardless of the sexual orientation of the harasser, so long as the harassed victim is of the harasser's "preferred" gender.

32

support, nor does the record support, either that Garrison had general hostility towards men or that he treated members of one gender differently from another.  Thus, the undersigned will only address the first *Oncale* example.

    a.    Garrison's "Sexual Desire" for Jones

Defendant  argues that the EEOC and Jones cannot show that Garrison harassed Jones because of his sex because there is no evidence that Garrison had a homosexual desire for Jones or that Garrison had a general hostility to males in the workplace. [Doc. 72-2 at 6-13].   Jones does not respond to this argument.[19]   [*See generally* Doc. 81].  The EEOC responds that the evidence shows that there is a material question of fact as to whether Garrison was either a homosexual or sexually attracted to Jones because (1) Garrison lived with a male, Assistant Manager Elliot; (2) Garrison appears to have been obsessed with Jones; (3) after seeing Jones and Lynn work together, Garrison separated the two and often scheduled them to work on different days;

---

[19]    Because Jones has failed to respond to this argument in his response to Defendant's motion for summary judgment, he is deemed to have abandoned this claim. *See Hammond v. Gordon County*, 316 F. Supp. 2d, 1262, 1280 (N.D. Ga. 2002); *see also Bute v. Schuller Int'l, Inc.*, 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) ("Because plaintiff has failed to respond to this argument or otherwise address this claim, the Court deems it abandoned."); *Welch v. Delta Air Lines, Inc.*, 978 F. Supp. 1133, 1137 (N.D. Ga. 1997) ("Plaintiff's failure to respond to Defendant's argument alone entitles Defendant to summary judgment on these claims.").

33

(4) upon seeing that Jones did not have any female friends visit him at work and that Jones did not "mess around" with the female employees, Garrison "launched an unending campaign" to determine Jones's sexuality and (5) after confiscating Jones's cell phone, Garrison launched a "vicious sex-based tirade" against Jones's friend, Smith, when she called to speak with Jones. [Doc. 83 at 19-20]. Defendant replies that Plaintiff has offered no credible evidence to show that Garrison had a homosexual or bi-sexual desire for Jones. [Doc. 91 at 3-7].

In order to establish a same-sex sexual harassment claim based sexual desire, a plaintiff must offer credible evidence of the harasser's homosexuality. *Oncale*, 523 U.S. 80; *see also Llampallas*, 163 F.3d at 1246; *Bundenz*, 230 F. Supp. 2d at 1273-74 & n.37. As noted above, the EEOC posits a number of facts it claims show a question of fact regarding Garrison's homosexuality or bisexuality.

The Court disagrees that there is sufficient evidence to support the EEOC's assertion that there is a material issue of fact as to whether Garrison was homosexual or bisexual, so that his conduct was motivated by a sexual desire for Jones. First, the Court notes that the EEOC's efforts to depose Garrison, who no longer works for Family Dollar, were unsuccessful and that no party questioned him regarding his sexuality. [Doc. 83 at 19]. The EEOC bears the burden to establish the existence of

34

AO 72A
(Rev.8/8
2)

an element essential to its case, *Celotex*, 477 U.S. at 322, and thus cannot raise the record's silence as a defense to summary judgment. Second, Garrison's inquiries regarding Jones's sexuality and Lynn's and Smith's[20] subjective beliefs that Garrison

---

[20]    Lynn testified as follows:

Like he [Garrison] be trying to be trying to call Kendrick gay because of the way he looked because he looked like a pretty boy type. And he asked me why Kendrick walk like that. I said I don't know, I don't even look at no other man like that, another boy.

He always came to me, what's wrong with your boy, and he always saying- - he always asking about Kendrick. To tell the truth about it, I thought he liked him because he always was talking about him. But I ain't never said anything to Kendrick about it.

(Lynn Dep. at 32). At Smith's deposition, the following colloquy occurred:

Q:    Did Kendrick ever tell you why he thought Michael Garrison was picking on him?

A:    He didn't know why, but I told him that I thought he just liked him.

Q:    You thought he disliked him?

A:    I thought he did like him because Kendrick never understood why he picked on him or maybe he didn't admit it, but I took it if someone picks at you like that, they like you. They- -

Q:    You say liked, what are you referring to, like him as an employee or like him as a person or like him in a relationship?

A:    Relationship kind of thing.

35

*might* like Jones do not show that Garrison was homosexual or bisexual and thus motivated by a homosexual desire for Jones.  Rather, this "credible evidence" is nothing more than speculation, which is insufficient to avoid summary judgment. *See Budenz*, 230 F. Supp. 2d at 1274 (finding that plaintiff's belief that the alleged harasser had homosexual desire for plaintiff because he touched plaintiff's shoulders and talked about his friends' "alternative lifestyles" did not constitute credible evidence of homosexuality of alleged harasser).  Third, it is rank speculation that Garrison was homosexual/bisexual and had a sexual desire for Jones simply because he lived with a male roommate.  Likewise, it is also impossible to draw the inference that Garrison had a sexual desire for Jones because he did not leave the store unattended and scheduled Jones and Lynn to work on different days.  As pointed out by Defendant, [Doc. 91 at 6], these actions are the actions of a reasonable store manager in Garrison's position and no reasonable inference of homosexuality or bi-sexuality can be inferred.  *See Brown v. Snow*, 440 F.3d 1259, 1266 (11th Cir. 2006) (refusing to draw an unreasonable inference from speculative testimony); *see also Holiday Wholesale Grocery Co. v. Philip Morris Inc.*, 231 F. Supp. 2d 1253, 1271 (N.D. Ga. 2002) ("[A]n inference is

_____

(Smith Dep. at 42).

36

unreasonable if a jury must engage in speculation and conjecture to such a degree as to render its finding 'a guess or mere possibility.' ") (citation omitted).

Finally, the Court recognizes that Garrison allegedly made inappropriate, vulgar, crude and offensive remarks to Jones's female friend, Smith.[21]  However, contrary to Plaintiff's arguments that Garrison's comments were the result of jealous rage, [Doc. 83 at 20-21], the record shows that the person who answered the phone was "snickering and breathing hard."  (Smith Dep. at 28-29).  This incident does not support a reasonable inference that Garrison was motivated by a sexual desire for Jones.  In fact, this incident does not show any evidence of sexuality at all.  Instead, the alleged statements and conduct in question "were nothing other than vulgar provocations having no causal relationship to [the plaintiff's] gender as a male." *English v. Pohanka of Chantilly, Inc*., 190 F. Supp. 2d 833, 846 (E.D. Va. 2002).  As a result, the Court

---

[21]    There is no evidence in the record to establish that Garrison was actually the person that Smith Spoke with.  Smith testified that she had never spoken with Garrison at the time of the call, did not know who she was speaking with, and only believes that Garrison was the person who answered the phone because she was told the same by Jones. [Smith Dep. at 24, 29]. Jones was not present for the call and was only told that Garrison answered his phone. [Jones Dep. at 73-77].  However, for summary judgment purposes, the Court will assume that Garrison was the individual with whom Smith spoke.

AO 72A
(Rev.8/8
2)

concludes that the phone call incident does not constitute "credible evidence" that Garrison was motivated by a sexual desire for Jones.

Viewing the facts in the light most favorable to the non-movants, the evidence is insufficient to withstand summary judgment on the same-sex sexual harassment claim. Accordingly, the Court **RECOMMENDS** that summary judgment be **GRANTED** as to the EEOC's (and to the extent not abandoned, Jones's) same-sex sexual harassment claim.

b.      *Gender Stereotype Sexual Harassment*

The EEOC and Jones argue that Garrison harassed Jones because he did not perceive Jones to be manly. [Docs. 81 at 2-8, 83 at 21-25]. Defendant replies that there is no probative evidence to establish the "because of sex" prong of a gender stereotyping claim, and that, at most Garrison's comments related to Jones's perceived sexual orientation. [Docs. 72-2 at 10-14; 91 at 8-11; and 92 at 3-6].

i.      *"Because of . . . Sex"*

In *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the Supreme Court held that in certain situations, discrimination based on gender stereotyping could qualify as discrimination based on sex under Title VII. The Court held:

38

> . . . [W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for " '[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.' " An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not.  Title VII lifts women out of this bind.

*Id.* at 251 (internal citations omitted).  In *Price Waterhouse*, the Court found that the plaintiff had been denied a promotion because the partners described her as "macho," needing "a course in charm school," and that she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled and wear jewelry."  *Id*. at 235.  The Court found that "[i]n the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender."  *Id*. at 250.  Thus, if the EEOC and Jones can show that Jones was subjected to harassment by Garrison based on Jones's perceived failure to conform to masculine stereotypes, a Title VII sexual harassment claim may be stated.  *Simonton*, 232 F.3d at 38 (recognizing that a "a suit [by a male] alleging harassment or disparate treatment based on nonconformity with sexual stereotypes is cognizable under Title VII as discrimination because of sex"); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261 n.4 (1st Cir. 1999)

39

(noting that a man can support a Title VII claim "on evidence that other men discriminated against him because he did not meet stereotyped expectations of masculinity"); *Mowery*, 2006 WL 327965, at * 18.

Courts have "understandably expressed some confusion" as to whether comments, like the ones in this case, are actionable under Title VII as relating to gender stereotypes, and not sexual orientation or the perception of homosexuality, both of which are not actionable. *Dawson v. Bumble & Bumble*, 398 F.3d 211, 223 (2d Cir. 2005); *see also Centola v. Potter*, 183 F. Supp. 2d 403, 408 (D. Mass. 2002) (noting that "the line between discrimination because of sexual orientation and discrimination because of sex is hardly clear [because s]ex stereotyping is central to all discrimination."). The Court notes, however, that the blurred line does not automatically render summary judgement less appropriate if there is no genuine material fact issue. *Chapman v. AI Transport*, 229 F.3d 1012, 1026 (11th Cir. 2000) (*en banc*) (holding "that the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale").

In support of their gender stereotyping claims, the EEOC principally relies on *Miller v. City of New York*, 177 Fed. Appx. 195 (2d Cir. 2006), while Jones cites to *Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864 (9th Cir. 2001). In *Miller*,

40

the Second Circuit Court of Appeals reversed a grant of summary judgment to a male plaintiff where his supervisor, also a male, made his work life miserable by (1) claiming that the plaintiff was not a "real man" or a "manly man," and (2) giving work assignments involving heavy lifting and truck work (which Miller was prohibited from performing due to a disability). The treatment was designed "to toughen [the plaintiff] up." *Miller*, 177 Fed. Appx. at 196. The supervisor also gave different assignments to male and female employees based on gender stereotypes. *Id.* at 197.

In *Nichols*, the Ninth Circuit Court of Appeals found that the plaintiff was harassed based upon his gender due to "a relentless campaign of insults, name-calling and vulgarities," where, at least once a week and often several times a day, he was mocked for walking and carrying his tray "like a woman"(i.e., for having feminine mannerisms); derided for not having sexual intercourse with a waitress who was his friend; taunted in English and Spanish as a "faggot" and a "fucking female whore" and his male co-workers and one of his supervisors repeatedly referred to him as "she" and "her." *Nichols*, 256 F.3d at 870. The *Nichols* Court found that the systematic abuse directed at the plaintiff reflected a belief that he did not act as a man should act - - walking like a woman, not having sex with a female, being referred to as "she" and

41

"her" and "the most vulgar name-calling directed at [him] was cast in female terms." *Id.* at 874.

*Miller* and *Nichols* are distinguishable from the present case. First, unlike the facts in those cases, Garrison did not question or confront Jones about his manliness. Jones testified that Garrison never told him that he was not manly, had feminine mannerisms, acted like a woman, or that his voice was feminine. (Jones Dep. at 129, 151).

Second, most of Garrison's comments referred to Jones's sexual orientation, not to his gender role. Jones testified that his coworkers told him that Garrison said that (1) he "liked boys and was gay" (Jones Dep. at 63-64); (2) he was "gay and likes boy's penis," (*id.* at 120 & Exh. 7); (3) he was "gay and that, he, Garrison, was going to fire him (Jones)" (*id.*); and (4) he "never got pussy, but he did get some ass." (*Id.* at 67, 90). Also, Garrison referred to Jones and an openly homosexual employee as "sugar-free," (*id.* at 106, 108, 110-11); and answered Jones's cell phone and told the female caller that "if she did not have a penis, or if she did not have surgery to get a penis, do not call [Jones] anymore because [Jones] don't like girls." (*Id.* at 120-22 & Exh. 7). These are not comments based on perceived gender stereotypes, but rather on sexual orientation or perceived sexual orientation.

42

Third, although not determinative, Jones admits that he quit working for Family Dollar because Garrison was teasing him about his *sexuality*, not his manliness.  (*Id*. at 84-85).  *See Oncale*, 523 U.S. at 81 (requiring assessment of the way statements were experienced by employee); *Hamm v. Weyauwega Milk Products, Inc.*, 332 F.3d 1058, 1063 (7th Cir. 2003).

The Court recognizes that some of the comments made by Garrison arguably implicate gender stereotypes.[22]  For example, Garrison  asked why Jones "walk like that," (Lynn Dep. at 32); stated that Jones was "half-female" when two female customers asked why there were no women working in the store, (Jones Dep. at 85); asked "where Kendrick's bitch ass," (Jones Dep. at 87); and stated to Jones when he was stocking feminine products, that he liked sticking things "up his butt" and "now you using tampons."[23]  (Lynn Dep. at 27).

---

[22]    Garrison's comment to Brooks that he "didn't have a breast for Kendrick to suck on," (Brooks Dep. at 44), does not create a reasonable inference of gender stereotyping.  Rather, this comment shows that Garrison believed Jones was acting like a baby.

[23]    As discussed below, even if these statements by Garrison do constitute unlawful gender stereotyping, the hostile work environment claims fail the severe and pervasive prong of a Title VII harassment claim.

43

Nonetheless, in analyzing gender stereotyping claims, the Court must consider "any stereotypical statements within the context of all of the evidence of harassment, and then determine whether the evidence as a whole creates a reasonable inference that the plaintiff was discriminated against because of his sex." *Kay v. Independence Blue Cross*, 142 Fed. Appx. 48, 50 (3d Cir. 2005) (citing *Spearman*, 231 F.3d at 1085). They must also be viewed in light of the social context in which they occur. *Oncale*, 523 U.S. at 81; *Hamm*, 332 F.3d at 1063. The record demonstrates that the Family Dollar workforce joked and engaged in horseplay, and that Garrison made jokes about employees of both sexes. (Lynn Dep. at 29-31, 45). Lynn testified that both he and Jones "laughed [ ] off" Garrison's tampon comment. (Lynn Dep. at 28-29). To the extent that these comments pertain to Garrison's version of a stereotypical male,[24] courts have recognized that sexually explicit remarks among male coworkers "may be simply expressions of animosity or juvenile provocation," which have no relationship to gender. *Mowery*, 2006 WL 327965, at * 29-30 (citing *Hamm*, 332 F.3d at 1064).

---

[24]     It is not all that clear that, other than the "half-female" and "using tampons" remarks, these comments refer to gender stereotypes. How Jones walked, referring to him as a bitch-ass, and references to inserting items in an anus, are just as reasonably interpreted as a reflection of Garrison's perception that Jones was homosexual.

44

When viewed in this context, the record clearly reflects that the harassment at issue was based primarily on Jones's perceived sexual orientation, rather than his gender or gender stereotypes.  Again, Lynn, the only witness other than Jones who actually worked at Defendant's facility, testified that Garrison made jokes about "everybody or anybody," and that people laughed at his jokes.  (Lynn Dep. at 29-32).  Further, Jones testified that Garrison was "childish" and "unprofessional" and was always making comments and giving everyone in the store nicknames.  (Jones Dep. at 52, 95, 142-44, 148, 159-60).  Here, within the context of all the harassment, a material fact question is not presented as to whether these comments occurred due to Garrison's perception that Jones did not fit the gender stereotype of a male.  Rather, the harassment stemmed from Jones's perceived sexual orientation or because Jones "experienced . . . a workplace environment characterized by teasing, animosity or jostling males."  *Mowery*, 2006 WL 327965, at * 30.

In this regard, this case is similar to *Hamm*, where the plaintiff alleged that he was subject to unlawful sexual harassment because he was referred to as a "faggot," his close friendship with another male coworker was perceived by co-workers to be romantic in nature, he was believed to be gay because he was single, and was told he had a "high-pitched voice," while being called "girl scout" and "kid."  *Hamm*,

45

332 F.3d at 1063-64.   The Seventh Circuit affirmed the district court's grant of summary judgment in favor of the employer.  It first found that many of the comments related to his job performance.  *Id.* at 1062-63.  However, it also concluded that the bulk of the comments related to speculation by his coworkers about his sexual orientation, which correlated to Hamm's own perception of the root of the harassment. *Id*. at 1063.  The court also found that the harassment was actually workplace teasing since the alleged harassers themselves and other co-workers also were victims of workplace pranks.  *Id*. at 1064.  The *Hamm* Court also pointed out that, even though some of the comments questioned Hamm's gender or sex, the totality of the workplace environment and the context in which the comments were made, undermined a claim of sexual harassment, because they related to speculation by his coworkers about his sexual orientation.  *Id*. at 1064-65.

In the present case, Jones was subjected to similar comments and teasing as the *Hamm* plaintiff.  The overall tenor of the harassment, combined with Jones's perception that it concerned his sexuality, *Hamm*, 332 F.3d at 1065 ("Hamm himself characterizes the harassment of his peers in terms of  . . . perceptions of his sexual orientation and does not link their comments to his sex."), leads the Court to conclude that the comments that were directed at Jones were not based on his sex or gender, but were

46

either based on his perceived sexual orientation or were horseplay at work. *See also Vickers*, 483 F.3d at 763 ("... [T]he gender non-conforming behavior which Vickers claims supports his theory of sex stereotyping is not behavior observed at work or affecting his job performance. Vickers has made no argument that his appearance or mannerisms on the job were perceived as gender non-conforming in some way and provided the basis for the harassment he experienced. Rather, the harassment of which he complains is more properly viewed as harassment based on Vickers' perceived homosexuality, rather than based on gender non-conformity.").

The harassment leveled at Jones also is unlike that in *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061 (9th Cir. 2002), cited as supportive by the EEOC. [Doc. 83 at 23]. In *Rene*, the court summarized the harassment as follows:

> Rene provided extensive evidence that, over the course of a two-year period, his supervisor and several of his fellow butlers subjected him to a hostile work environment on almost a daily basis. The harassers' conduct included whistling and blowing kisses at Rene, calling him "sweetheart" and "muñeca" (Spanish for "doll"), telling crude jokes and giving sexually oriented "joke" gifts, and forcing Rene to look at pictures of naked men having sex. On "more times than [Rene said he] could possibly count," the harassment involved offensive physical conduct of a sexual nature. Rene gave deposition testimony that he was caressed and hugged and that his coworkers would "touch [his] body like they would to a woman." On numerous occasions, he said, they grabbed him in the crotch and poked their fingers in his anus through his clothing. When asked what he

47

> believed was the motivation behind this harassing behavior, Rene
> responded that the behavior occurred because he is gay.

*Id.* at 1064.  Despite Rene's belief that he was harassed because he was gay, the *Rene*

Court concluded that he asserted a valid Title VII claim.  It found that the physical

contact was of a sexual nature, because the plaintiff's "tormenters did not grab his

elbow or poke their fingers in his eye.  They grabbed his crotch and poked their fingers

in his anus."  *Id.* at 1065.   As a result, the sexual orientation of the plaintiff was

irrelevant.  *Id.* at 1066.  On this basis, *Rene* is inapposite to, and not instructive for, the

present dispute.

Doe by Doe v. City of Belleville, Ill., 119 F.3d 563 (7th Cir. 1997), *vacated and*

*remanded on other grounds by* City of Belleville v. Doe by Doe, 523 U.S. 1001 (1998),

also is not on point.  There, coworkers repeatedly harassed a young co-employee

verbally (including threats of sexual assault) and physically (including grabbing his

testicles) because he wore an earring, and repeatedly asked him whether he was a girl

or a boy.  *Doe*, 119 F.3d at 567, 580-83.  The conduct complained of by Jones and the

EEOC does not even come close to this sexual stereotyping harassment.

Finally, the Court has considered this case in light of *Centola*, *supra*, a case no

party cited.  In *Centola*, the plaintiff was homosexual, but never disclosed that to his

48

AO 72A
(Rev.8/8
2)

coworkers. Nonetheless, his coworkers consistently taunted him by (1) taping a picture of Richard Simmons in pink hot pants to his workspace, (2) asking him if he would be marching in a gay parade and whether he had gotten AIDS yet, and (3) calling him a "sword swallower" and using anti-gay epithets. Also, supervisors and managers treated Centola differently from other male and female employees, such as by following him, but not others, into the bathroom to "check on him," and by disciplining him more severely than coworkers for minor conduct and attendance infractions. *Centola*, 183 F. Supp. 2d at 407.

In denying summary judgment, the *Centola* Court held that the plaintiff did not need to allege that his sex alone or that sexual orientation played no part in his treatment, because he could recover based on proof of a " 'mixed motive,' a combination of a lawful and unlawful motive. . . Thus, if Centola can demonstrate that he was discriminated against 'because of . . . sex' as a result of sexual stereotyping, the fact that he was also discriminated against on the basis of his sexual orientation has no legal significance under Title VII." *Id.* at 409-10 (footnote omitted). The court continued:

> A mixed motive approach is important here, precisely because of the difficulty in differentiating behavior that is prohibited (discrimination on the basis of sex) from behavior that is not prohibited (discrimination on

49

the basis of sexual orientation).  Sexual orientation harassment is often, if not always, motivated by a desire to enforce heterosexually defined gender norms.  In fact, stereotypes about homosexuality are directly related to our stereotypes about the proper roles of men and women. While one paradigmatic form of stereotyping occurs when co-workers single out an effeminate man for scorn, in fact, the issue is far more complex.   The harasser may discriminate against an openly gay co-worker, or a co-worker that he perceives to be gay, whether effeminate or not, because he thinks, "real men don't date men."  The gender stereotype at work here is that "real" men should date women, and not other men.  Conceivably, a plaintiff who is perceived by his harassers as stereotypically masculine in every way except for his actual or perceived sexual orientation could maintain a Title VII cause of action alleging sexual harassment because of his sex due to his failure to conform with sexual stereotypes about what "real" men do or don't do.

*Id.* at 410 (footnote omitted).

*Centola* does not assist the EEOC and Jones in this case.  First, nowhere in their briefs opposing Family Dollar's motion do they assert that a mixed motive analysis is appropriate in this case.  Second, it does not appear that mixed motive analysis applies to a hostile work environment claim, since that analysis is designed for a challenge to an adverse employment decision in which both legitimate and illegitimate considerations played a part. *Price Waterhouse*, 490 U.S. at 247.  As one appeals court has noted, an employer could never have a legitimate reason for creating a hostile work environment.  *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1326 (8th Cir. 1994).  The analysis employed by this Court - - considering "any stereotypical

50

statements within the context of all of the evidence of harassment, and then determin[ing] whether the evidence as a whole creates a reasonable inference that the plaintiff was discriminated against because of his sex," *Kay*, 142 Fed. Appx. at 50; *Spearman*, 231 F.3d at 1085 - - leads to the conclusion that there is no material fact issue as to whether Jones was harassed because of his perceived homosexuality as opposed to not fulfilling gender stereotypes.

As a result, neither the EEOC or Jones have satisfied the "because of . . . sex" prong for a *prima facie* case of sexual harassment based on gender stereotyping. Accordingly, the Court **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED** on the claim of sexual harassment.

In the event that the District Court disagrees, following is a discussion of the remaining *prima facie* case element in dispute.

ii.    *Severe and Pervasive*

Defendant argues that the EEOC and Jones cannot show that the harassment of Jones was severe and pervasive.  [Doc. 72-2 at 13-19].  The EEOC responds that Garrison engaged in a "campaign of harassment" that began when Jones was hired and continued until the end of Jones's employment, which given his age of seventeen and considering the totality of the circumstances, satisfies the severe and pervasive prong.

51

[Doc. 83 at 25-31].   Jones similarly responds that, given Jones's age, Garrison's comments satisfy the severe and pervasive prong of the *prima facie* case.  [Doc. 81 at 8-10].  Defendant replies that reliance on Jones's young age does not in and of itself establish the severe and pervasive prong.  Instead, Defendant argues that Garrison's comments must be viewed based on the totality of the circumstances, which shows that the conduct was neither severe nor pervasive.  [Docs. 91 at 11-14 and 92 at 6-9].

In order to be actionable under Title VII, sexually harassing conduct must be sufficiently severe or pervasive to alter an employee's terms or conditions of employment and includes subjective and objective components.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris*, 510 U.S. at 21-22); *Miller v. Kenworth of Dothan,* 277 F.3d 1269, 1276 (11th Cir. 2002).  Family Dollar does not appear to dispute that Jones found the conduct to be subjectively severe, since it does not argue otherwise in its brief.  [*See generally* Doc. 72-2].  In any event, the law is clear that "[h]arassment is subjectively severe and pervasive if the complaining employee perceives the harassment as severe and pervasive."  *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (citing *Mendoza*, 195 F.3d at 1246).  The evidence in this case is that Jones complained about Garrison's

52

AO 72A
(Rev.8/8
2)

comments to Garrison and his mother, who in turn complained to Garrison. As a result, the EEOC and Jones satisfy the subjective component of this test.

In evaluating the objective component of the "severe or pervasive" prong, the Court examines whether the actions of the employer altered the employee's working conditions to such an extent that a reasonable person would find the atmosphere hostile and abusive. *Harris*, 510 U.S. at 22-23. To determine whether the complained of statements and conduct are sufficiently severe or pervasive from an objective standpoint, courts in the Eleventh Circuit consider the following four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Criswell v. Intellirisk Mgt. Corp.*, No. 07-15280, 2008 WL 2736803, at * 2 (11th Cir. July 15, 2008) (quoting *Mendoza*, 195 F.3d at 1246). No single factor in the analysis is dispositive; instead, whether a reasonable person would find Jones's work environment to be hostile depends on the totality of circumstances. *Collier v. City of Opelika*, 374 F. Supp. 2d 1098, 1101 (M.D. Ala. 2004); *see also Mendoza*, 195 F.3d at 1258 (A court must "look[] to the totality of the circumstances to determine whether harassment is sufficiently severe or pervasive to alter the conditions of the plaintiff's

53

employment and create an abusive working environment."). These requirements serve to ensure that Title VII does not become "a general civility code." *Oncale*, 523 U.S. at 80.

Preliminarily, as Defendant correctly argues, Jones's age alone does not establish objective severity or pervasiveness. *But see EEOC v. R&R Ventures*, 244 F.3d 334, 338-39 (4th Cir. 2001) (harasser made sexually explicit comments only to young female employees). Instead, the Court must look to the totality of the circumstances regarding Jones's employment with Family Dollar and the comments made by Garrison.

### (a) Frequency

The Eleventh Circuit has explained that conduct is frequent when there are " 'repeated incidents of verbal harassment that continue despite the employee's objections . . . .' " *Miller*, 277 F.3d at 1276 (quoting *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 704 (7th Cir. 2001)). As noted in the recitation of facts, *supra* at 8, Jones Dep. at 96, Jones stated that the harassment occurred every day and sometimes twice a day. However, he also testified that no harassment occurred during his second week of employment. (Jones Dep. at 56). He specifically recalled only three specific comments made to him, and then testified that he wrote those in his diary because they were "truly embarrassing," "stand out" or "important." (*Id.* at 91-92, 116). As a result,

54

the Court does not regard his general statements, that comments were made "every day"

and sometimes "twice a day" as establishing the frequency element of the objective

hostility prong, or in considering whether a material fact question exists on this aspect

of his *prima facie* case. *See, e.g., Carson v. Giant Food, Inc.*, 187 F. Supp. 2d 462, 477

n.24 (D. Md. 2002) ("General allegations lacking in dates, times, and circumstances are

without the particularity required to support a claim of racial harassment."); *see also*

*Godoy v. Habersham County*, No. 06-11946, 2006 WL 3592415, at * 2 (11th Cir. Dec.

12, 2006) (requiring employee to "present concrete evidence in the form of specific

facts, not just conclusory allegations and assertions" to establish a hostile work

environment); *Johnson v. Connecticut Dep't of Corr.*, 392 F. Supp. 2d 326, 341

(D. Conn. 2005) (despite plaintiff's claim of "constant ridicule," he did not provide any

specific examples of ridicule or insult, and thus the mere allegation of this conduct

alone not sufficient); *Rossi v. Troy State Univ.*, 330 F. Supp. 2d 1240, 1245

(M.D. Ala. 2002) (finding that broad allegation was insufficient to establish a hostile

work environment).

　　　As to the specific incidents Jones recounted, during the approximate one month

period that Jones worked at Family Dollar Store # 728, Jones heard Garrison: (1) refer

to him as "half female" when two female customers in the store asked why there were

55

not more female employees, (Jones Dep. at 85-86); (2) scream across the store "where is Kendrick's bitch ass?" (*Id.* at 88); and (3) state "Kendrick don't get pussy, but he do get some ass." (*Id.* at 67, 90).[25]  Even if these statements are considered a comment on Jones's masculinity, and thus actionable, such isolated conduct does not satisfy the severe and pervasive prong. *See Puckett v. City of Portsmouth*, 391 F. Supp. 2d 423, 436 (E.D. Va. 2005) (finding that three incidents in one month period did not establish that conduct was severe or pervasive); *Gharzouzi v. Northwestern Human Servs. of Penn.*, 225 F. Supp. 2d 514, 536 (E.D. Pa. 2002) (finding no severe or pervasive behavior where plaintiff alleged six incidents in three months, including one month with three incidents); *Noble v. Monsanto Co.*, 973 F. Supp. 849, 857 (S.D. Iowa 1997) (concluding that three incidents that occurred in close succession were not sufficiently severe or pervasive to constitute a hostile work environment); *Garcia v. ANR Freight Sys., Inc.*, 942 F. Supp. 351, 356 (N.D. Ohio 1996) (three sex-based incidents involving a co-worker during five-day orientation did not permeate the workplace creating an abusive work environment); *see also Faragher*, 524 U.S. at 788 (1998) (indicating that

---

[25]      Again, it is not clear that the last statement was a comment on gender stereotypes as opposed to a perception of homosexuality.  *See* note 24, *supra*.

56

AO 72A
(Rev.8/8
2)

"isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment' ").

Nor can the EEOC or Jones bootstrap the frequency requirement by combining these three comments with either (1) Garrison's statements made to Lynn or others and told second-hand to Jones or (2) the statements which clearly pertained to Jones's sexual orientation or Garrison's perception of his sexual orientation.[26]  For example, Garrison's comments that Jones was gay or liked boys, that he likes a boy's penis, that he was gay and was going to fire him, that Mia Smith should not call back until she had a penis, and calling Maurice and Jones "sugar-free" all relate to a(n incorrect) perception of Jones's sexual orientation and are not actionable.  Moreover, even if the Court combines the three comments Jones considered serious enough with Garrison's comment which Lynn, but not Jones, claimed to have heard - - that Jones was putting "stuff up butt" and using tampons[27] - - and Garrison's questioning of Lynn as to why Jones "walk like that," such a small number of incidents occurring within a short period

_____

[26]    Garrison's statements about Ying-Yang and Jones looking like he could make a bomb in his room do not reflect upon Jones's sexual characteristics.

[27]    Jones was present when this comment was made, but Lynn stated that he and Jones laughed it off, and, of course, the incident did not qualify as significant enough for entry into Jones's diary.

57

of time have been held not to be pervasive. *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 59-60 (2d Cir. 2004) (six incidents in one month "far from being pervasive" because incidents "were few and occurred within a short span of time."); *Presley v. Pepperidge Farm, Inc.*, 356 F. Supp. 2d 109, 120 (D. Conn. 2005) (several isolated incidents over one month not pervasive).

The Court recognizes that infrequency of the complained-of incidents is not dispositive, and that a few incidents over a "short and intense period" may qualify as severe. *See Miller*, 277 F.3d at 1276 (there is no "magic number" of offensive comments that must be made in order for harassment to create a hostile work environment); *see also Hulsey v. Pride Restaurants, LLC.*, 367 F.3d 1238, 1248 (11th Cir. 2004) ("Garrison's conduct was frequent, occurring at least 18 times during the approximately 2 to 2-1/2 weeks between his initial attempt to get Hulsey to date him and her termination on August 16, 2001."); *Olson v. Lowe's Home Centers Inc.*, 130 Fed. Appx. 380, 388-89 (11th Cir. 2005) (offensive conduct several times a week over two and one-half months). *But see Hewlett v. Waffle House, Inc.*, No. 3:04-CV-111 (CDL), 2006 WL 1582423, at * 3 (M.D. Ga. June 5, 2006) (two offensive comments on one day not sufficiently frequent). However, the small number of arguably actionable comments counts against finding that the conduct altered the terms

58

or conditions of Jones's employment, particularly, as noted below, none of the comments was severe.

### (b) Severity

Next, the Court determines whether the conduct at issue was objectively severe. Conduct is severe when the work environment is " 'permeated with discriminatory intimidation, ridicule and insult, not where there is the 'mere utterance of an . . . epithet.' " *Miller*, 277 F.3d at 1276-77 (quoting *Harris*, 510 U.S. at 21). That is, the Eleventh Circuit has instructed that courts should not consider the severity of each utterance, but the "severity of all the circumstances taken together." *Reeves v. C.H. Robinson Worldwide, Inc.*, 525 F.3d 1139, 1146 (11th Cir. 2008).

"The objective component of this analysis is somewhat fact intensive." *Mendoza*, 195 F.3d at 1246. In that regard, the United States District Court for the Southern District of Georgia has explained that adjudicating fact-specific sexual harassment cases often leaves federal courts in the unfortunate position of "decid[ing] what is 'sufficiently severe' by resorting to 'crudity comparables.' That is, judges must compare the crudity and 'lewdity' found in one case with that deemed sufficient to survive a Rule 50 or 56 motion in another." *Breda v. Wolf Camera, Inc.*, 148 F. Supp. 2d 1371, 1376 (S.D. Ga. 2001).

59

First, the Court notes that the EEOC's and Jones's allegations consist entirely of offensive statements.  A hostile work environment generally does not arise from the "mere utterance of an . . . epithet which engenders offensive feelings in an employee." *Harris*, 510 U.S. at 21.

Also, many of the statements are not even accurately described as reflecting upon gender stereotypes.  *See* notes 24 & 25, *supra*.  As such, they are too ambiguous to be interpreted as gender-stereotype hostility.  *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583-84 (11th Cir. 2000) (finding ambiguous statements irrelevant to plaintiff's hostile work environment claim).

The Court concludes that Garrison's comments were not severe.  First, they were not laced with profanities, nor accompanied by lewd or sexually suggestive physical actions or displays.  Jones testified that Garrison never propositioned him for sex or ever touched him in a sexual manner.  (Jones Dep. at 149, 156).

Next, Jones's reaction to Garrison's comments was not consistent with the level of severity he and the EEOC now allege.  Specifically, Jones stated to his mother "I know who I am" when discussing Garrison's comments with her.  (Brooks Dep. at 50).  This comment also demonstrates that Jones's youthful age is not a determinative

60

factor.  Also, Jones "laughed off" at least one of the arguably offensive comments (concerning tampons).  (Lynn Dep. at 28-29).

Third, many of Garrison's alleged comments were uttered outside of  Jones's presence.  As such, while they could contribute to the overall unpleasant environment because Jones was told about them close in time to statements made directly to him, these comments are less severe and humiliating than those occurring within his presence.  *Harper v. ULTA Salon Cosmetics & Fragrance, Inc.*, Civil Action File No. 1:05-cv-1285-TWT, 2007 WL 528088, * 33 (N.D. Ga. Feb. 13, 2007); *see also Mason v. S. Ill. Univ. at Carbondale,* 233 F.3d 1036, 1046 n.9 (7th Cir. 2000) (" '[T]hrough the grapevine' or 'second-hand' conduct is not sufficiently severe or pervasive so as to create a hostile work environment."); *Caruso v. City of Cocoa, Fla.,* 260 F. Supp. 2d 1191, 1221-22 (M.D. Fla. 2003) (citing cases and finding that offensive comments made outside of plaintiff's presence were not severe); *Mowery*, 2006 WL 327965, at * 12 (same).

The severity of the comments in this case does not compare to those in other cases.  *See Willetts v. Interstate Hotels, LLC*, 204 F. Supp. 2d 1334, 1337 (M.D. Fla. 2002) (conduct not severe where over seven year period, harasser hugged plaintiff 20 times in sexualized manner, rubbed his head and shoulders, frequently indicated he

61

loved plaintiff, once kissed plaintiff on neck, once grabbed his buttocks, and once placed his hand on plaintiff's thigh near his crotch); *Winters v. Fla. Dep't of Corr.*, 203 F. Supp. 2d 1305, 1311 (M.D. Fla. 2001) (unwanted touching six or seven times over four to five month period severe).  As summarized above, the severity of the conduct in *Doe* (being asked if he was a boy or a girl, threatened with sexual assault and grabbed by the testicles); *Miller* (comments directly to plaintiff that he wanted to make a man out of him, saying he was not a"real man" and devising work assignments inconsistent with Miller's disabling condition);and *Nichols* (systematic abuse directed at the plaintiff reflecting a belief that he did not act as a man should act - - walking like a woman, not having sex with a female, being referred to as "she" and "her" and "the most vulgar name-calling directed at [him] was cast in female terms"),  was far greater than that experienced by Jones in this case.

The Court therefore concludes that while Garrison's comments were boorish, rude, childish, unprofessional and ignorant, they are not severe for purposes of Title VII.  As a result, this factor weighs against a finding of hostile work environment.

*(c) Physically Threatening or Humiliating*

As noted above, none of Garrison's comments was physically threatening. Garrison did not threaten Jones or otherwise offensively tough him.  On the other hand,

62

the Court observes that remarking in front of female customers that Jones was "half-female," and to a lesser extent, calling him a "bitch ass" is potentially humiliating. However, given the sporadic nature of these comments, the Court concludes that a reasonable person in Jones's position would not find these comments sufficiently humiliating to have altered the terms and conditions of his employment.

### (d) Interference with Job Performance

Although Jones testified that he was stressed out from the comments, (Jones Dep. at 168), he also conceded that he finished his shift after two of the three actionable comments.  (Jones Dep. at 86 (following "half-female" remark), 89-90 (following "bitch-ass" remark).  As to the "Kendrick don't get no pussy" remark, Jones testified that he responded that "I ain't gay" and walked off.  (Jones Dep. at 70).  There is no further evidence in the record as to how that remark, even if directed at a gender stereotype, adversely interfered with Jones's job performance.

Moreover, Jones testified that his job performance at Family Dollar was never an issue, that Garrison believed he was doing a good job and wanted to make him a manager.[28]  [Jones Dep. at 153-154].

---

[28]     Specifically, Jones testified:

Q:     Did Garrison ever criticize the way you were doing your job?

63

Based on this evidence, the Court concludes that as a matter of law, Garrison's actionable comments did not unreasonably interfere with Jones's job performance.

As a result, even if Garrison's harassment was based upon Jones's sex, the EEOC and Jones have failed to establish that the harassment was objectively "sufficiently severe or pervasive to alter [Jones's] terms or conditions of employment." *Faragher*, 524 U.S. at 787; *Oncale*, 523 U.S. at 81. Accordingly, the Court **RECOMMENDS**

---

A:    No. Actually, he thought I doing a good job.

Q:    How do you know that?

A:    Because he wanted to make me manager.

Q:    Assistant manager?

A:    Not assistant manager, but I guess just a regular- - he gave me some handbooks or something on management or something, but I was like, I ain't interested in that.

Q:    When was this?

A:    I don't know the time frame.

Q:    Did he tell you why he was giving you those books:

A:    No, he was just like - - you know, he told me I do a good job working. *You know, that was never an issue about my job performance, like getting stuff done*.

(Jones Dep. at 153-54) (emphasis added).

64

that summary judgment be **GRANTED** as to the EEOC's and Jones's Title VII hostile work environment sexual harassment claims.

### III.   Constructive Discharge

Defendant argues that the EEOC and Jones cannot establish a constructive discharge claim because Garrison's conduct did not rise to the level of an actionable hostile work environment claim.  Defendant further argues that even if Garrison's conduct did amount to an actionable claim, the conduct did not warrant Jones quitting.  [Doc. 72-2 at 14-15].  The EEOC responds that Jones was forced to resign from Family Dollar because it was clear that the harassment would not stop.  [Doc. 83 at 33-36].  Jones did not respond to Defendant's arguments.[29]  [*See* Doc. 81].

Defendant replies that the EEOC has not established an actionable same-sex sexual harassment claim.  Defendant also argues that even if  could establish a constructive discharge claim, Defendant was not provided the opportunity to correct the harassing conduct.  [Docs. 91 at 14-15, 92 at 9-10].

---

[29]      Therefore, Jones is deemed to have abandoned this claim.  *See* note 19, *supra*.  Even if Jones is not deemed to have abandoned his constructive discharge claim, summary judgment still is appropriate for the same reasons discussed in the text pertaining to the EEOC's identical claim.

65

A constructive discharge exists where "the employer deliberately[30] makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Doe v. DeKalb County Sch. Dist.*, 145 F.3d 1441, 1450 (11th Cir. 1998) (quoting *Young v. Southwestern Sav. and Loan Assoc.*, 509 F.2d 140, 144 (5th Cir. 1975)).  As the Supreme Court recently observed:

> The constructive discharge here at issue stems from, and can be regarded as an aggravated case of, sexual harassment or hostile work environment. For an atmosphere of sexual harassment or hostility to be actionable, we reiterate,  . . . , the offending behavior "must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor*, 477 U.S. at 67[ ] (internal quotation marks and brackets omitted).  A hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so

---

[30]    Despite the Eleventh Circuit's use of the word "deliberatively" in *Doe*, and some lower court decisions requiring a showing of deliberateness to make a constructive discharge claim,  *see, e.g., Cross v. Southwest Recreational Indus., Inc.*, 17 F. Supp. 2d 1362, 1376 (N.D. Ga. 1998) (indicating that "the employer's actions leading to the decision to quit must have been deliberate, that is, they 'must have been taken with the intention of forcing the employee to quit' ") (citation omitted), a plaintiff does not need to show that the employer actually imposed the intolerable conditions with the purpose of ridding the employer of the plaintiff. *Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d 61, 65 (5th Cir. 1980) (rejecting defendant's suggestion that a plaintiff must prove a constructive discharge by showing that "the imposition of intolerable working conditions [were] with the purpose of forcing the employee to resign"). Instead, a plaintiff must show that the "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id.* (quoting *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977)).

66

intolerable that a reasonable person would have felt compelled to resign. *See, e.g., Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1160 ([8[th] Cir.] 1999) ("[A]lthough there may be evidence from which a jury could find sexual harassment, . . . the facts alleged [for constructive discharge must be] . . . so intolerable that a reasonable person would be forced to quit."); *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 ([7[th] Cir.] 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.").

*Pennsylvania State Police v. Suders,* 542 U.S. 129, 146-47 (2004) (footnote omitted).

Consistent with *Suders*, the Fifth Circuit Court of Appeals has held:

Mere harassment, alone, is insufficient; rather, the plaintiff must show "aggravating factors" to justify departure. *See Barrow v. New Orleans Steamship Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994). Such factors include (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001). Ultimately, to succeed on a constructive discharge claim, the plaintiff must show a greater degree of harassment than is required for a hostile work environment claim. *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998).

*Hockman v. Westward Comm., LLC*, 407 F.3d 317, 332 (5th Cir. 2004); *see also Evans v. Mobile Infirmary Med. Ctr.*, No. Civ.A. 04-0364-BH-C, 2005 WL 1840235, at * 14-15 (S.D. Ala. Aug. 2, 2005) (relying on *Suders* and *Hockman*). As this Court has held,

AO 72A
(Rev.8/8
2)

> When a court is confronted with a "hostile-environment constructive discharge case," the "[c]reation of a hostile work environment is a necessary predicate" to the constructive discharge claim. [*Suders*, 542 U.S.] at 149. Thus, the plaintiff must show the offending behavior was sufficiently severe or pervasive such that the working conditions became "so intolerable that a reasonable person would have felt compelled to resign." *Id.* at 146-47. In other words, a plaintiff must show "harassment ratcheted up to the breaking point." *Id.* at 148.

*Harper*, 2007 WL 528088, at * 23.

As noted above, neither the EEOC or Jones have demonstrated the existence of a material fact question as to whether Jones suffered a hostile work environment based on sexual harassment. Since they have not shown actionable harassment, much less "harassment ratcheted up to the breaking point," *Suders*, 542 U.S. at 148, the constructive discharge claim fails.

Even if a viable hostile work environment claim was not a prerequisite to a successful constructive discharge claim, the EEOC's and Jones's claims fail. Courts use an objective standard to determine whether a plaintiff has established a constructive discharge claim, and, therefore, they do not consider a plaintiff's subjective feelings. *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001). Under this objective standard, a plaintiff "must show that [his] working conditions were 'so difficult . . . that a reasonable person would have felt compelled to resign.' " *Walton*

68

*v. Johnson & Johnson Servs., Inc*., 347 F.3d 1272, 1282 (11th Cir. 2003) (quoting *Pipkins v. City of Temple Terrace, Fla*., 267 F.3d 1197, 1201 (11th Cir. 2001)). Also, a plaintiff must also show that the intolerable conditions resulted from discriminatory acts. *See Stedman v. Bizmart, Inc.*, 219 F. Supp. 2d 1212, 1224-25 (N.D. Ala. 2002). The mere fact that a working environment becomes less attractive to the employee does not make the environment objectively intolerable. *Hipp*, 252 F.3d at 1235.

The EEOC (and Jones, if his claim is not deemed abandoned) cannot meet this rigorous standard. Although there is evidence that Jones confronted Garrison (who was the only person to whom he knew to complain), requested that Garrison stop making comments, and that Garrison did not stop, a reasonable person would not have felt compelled to resign. First, as discussed above, many of Garrison's comments, while improper, are not actionable, and thus cannot be used to establish the "intolerable" environment necessary for a constructive discharge claim. *Stedman*, 219 F. Supp. 2d at 1224-25. Second, a number of the statements were not made in Jones's presence, and therefore are considered less severe than those made directly to him. *See Harper*, 2007 WL 528088, at * 33. In addition, the three comments made in Jones's presence, even if actionable, were not severe and thus could not, as a matter of law, have made Jones's workplace intolerable.

69

Fourth, although not dispositive, there is no admissible evidence that Garrison wanted Jones to resign. While Jones testified that Lynn told him that Garrison wanted him to quit, *see* p. 16, *supra*, nowhere in Lynn's deposition does he claim that Garrison told him that he wanted Jones to quit. *See generally* Lynn Dep. Therefore, Jones's testimony is hearsay. "[I]nadmissible hearsay cannot be considered on a motion for summary judgment." *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (quotation and citation omitted).

In fact, Jones admits that Garrison thought he did a good job and wanted to promote him to manager. (Jones Dep. at 153-54). Thus, even viewing the evidence in the light most favorable to Plaintiff, the Court finds it extremely unlikely that Garrison's comments were made in a purposeful attempt to force Jones to resign.

Fifth, although Jones and Brooks located a 1-800 number for Family Dollar on June 16, 2004,[31] (following the Smith phone call incident) and left a message with Defendant reporting the harassment, Jones only worked one more day at Family Dollar before turning in his resignation on June 23, 2004. Generally, before a court may find that a constructive discharge has occurred, an employer must be given sufficient time

---

[31] Jones mother placed a second call to Family Dollar's 1-800 number after Jones handed in his resignation. However, this call is not relevant since Jones resigned before giving Defendant a chance to correct Garrison's harassing behavior.

to remedy the situation. *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996). This was an insufficient amount of time to allow Family Dollar to remedy the situation.[32] *See Kimsey v. Akstein*, 408 F. Supp. 2d 1281, 1303 (N.D. Ga. 2005) (stating that "Title VII does not create a cause of action for constructive discharge where - as happened here - the employee assumes the worst and resigns before giving management a chance to rectify the situation" when only a few days had passed between plaintiff filing an internal complaint of harassment and her resignation.).[33]

---

[32]     Defendant did investigate Jones's claims in late July or early August of 2004 after receiving notice from Jones's counsel. The Court expresses no opinion on the adequacy of this investigation since Jones resigned before Defendant addressed his complaint.

[33]     Neither the EEOC or Jones argued that *Suders* might have interred the requirement that constructive discharge plaintiff give notice before an employer can be held liable for constructive discharge. As a result, the Court does not address this issue in detail.

The Court notes, however, that the Supreme Court in *Suders* explained that a constructive discharge involves (1) the plaintiff's decision to leave, which involves no official action, and (2) precipitating conduct, which may or may not involve official action. *Suders*, 542 U.S. at 148. An official act exists when a supervisor uses her position to the employee's disadvantage such as demoting plaintiff, assigning plaintiff to a dangerous job, reducing plaintiff's pay, or making a disadvantageous transfer. *Id.* at 134, 148. Also, the Supreme Court appears to indicate that the official act must serve as "the last straw," so that the employer would have reason to suspect that the plaintiff's resignation was not the typical resignation. *Id.* at 148. If there is no official action,

AO 72A
(Rev.8/8
2)

Thus, the Court **RECOMMENDS** that summary judgment be **GRANTED** as to the constructive discharge claim.

### IV.    *Jones's Pendent State Law Claim*

Defendant has not moved for summary judgment on Jones's state law claim for intentional infliction of emotional distress.  Generally, however, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction" and dismiss the state claims as well.  28 U.S.C. § 1367(c)(3); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726-27

---

such as sexual or racial comments (as in this case), a defendant will not be liable if it can establish the affirmative defense outlined in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 633 (1998), and *Faragher*, *supra*, namely the defendant must "show[ ] both (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of sexual harassment, and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventative or remedial apparatus." *Suders*, 542 U.S. at 134, 148-49.  The *Ellerth/Faragher* affirmative defense is not available, however, when the supervisor takes an official action.  *Id.*

In the present case, Defendant did not satisfy the requirements of a proper *Ellerth/Faragher* defense.   It only proffered that when Ross conducted his investigation, Defendant's "poster, including its harassment policy was in Store # 728, when he conducted his investigation." D ¶ 18, Ross Dep. at 110.  Jones's unrebutted testimony is that he was unaware of any anti-harassment policy and did not see the poster.  (Jones Dep. at 42-43, 47).  As a result, Defendant has not made the adequate showing in order to raise the *Ellerth/Faragher* affirmative defense.

72

(1966); *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997).

District courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. District courts have supplemental jurisdiction over all other claims, including state-law claims, that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction. . . ." 28 U.S.C. § 1367(c). When deciding whether to exercise supplemental jurisdiction over a state-law claim, a district court should consider, among other factors, "judicial economy, convenience, fairness and comity." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1288 (11th Cir. 2002) (noting "the argument for dismissing state law claims in order to allow state courts to resolve issues of state law is even stronger when the federal law claims have been dismissed prior to trial").

There is no compelling reason why the Court should retain jurisdiction to adjudicate Jones's state law claim. Moreover, the Court is empowered to act under

73

AO 72A
(Rev.8/8
2)

§ 1367(c), and may do so *sua sponte*.   *Rittenhouse v. DeKalb County*, 575 F. Supp. 1173, 1175 (N.D. Ga. 1975); *see also* FED. R. CIV. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

Accordingly, if the District Court agrees with the conclusions in this R&R that summary judgment be granted on the federal claims asserted by Jones, then the undersigned **RECOMMENDS** that Plaintiff's state law claims be **DISMISSED WITHOUT PREJUDICE**.

### V.    *Motion For Attorney's Fees and Costs*

Defendant argues that it is entitled to attorney's fees and costs from the EEOC because it cannot make out a *prima facie* case sexual harassment or constructive discharge.   Defendant further argues that if the EEOC had used its guidelines to properly evaluate this claim before bringing suit, it would have come to the conclusion that Jones was not the victim of actionable sexual harassment.  [Doc. 72-2 at 23-25]. The EEOC responds that the issues raised in this case are issues of first impression in the Eleventh Circuit, and prior to bringing suit, it conducted an investigation, which led it to conclude that Jones was subjected to a hostile work environment and constructively discharged because of his sex.  [Doc. 83 at 36-37].

74

A district court may, in its discretion, award attorney's fees and costs to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith. *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978).[34] Evidence of bad faith is not necessary in determining that a claim is frivolous, but it may be considered. *Id.* at 419.  Defendant must establish that the case brought against it was so lacking in arguable merit as to be groundless or without foundation. *Jones v. Texas Tech Univ.*, 656 F.2d 1137, 1145 (5th Cir. 1981).  The fact that the motion for summary judgment was granted does not necessarily mean that a plaintiff's action was frivolous. *O'Neal v. DeKalb County, Ga.*, 850 F.2d 653, 658 (11th Cir. 1988).  Nor does a weak claim necessarily make the claim frivolous. *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

Instead, in determining whether a case is frivolous, the Court must examine "(1) whether the plaintiff established a prima facie case, (2) whether the defendant

---

[34]      42 U.S.C. § 2000-5(k) provides:

In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

75

offered to settle, and (3) whether the trial court dismissed the case prior to trial or held a full-blown trial on the merits." *Turner v. Sungard Business Systems, Inc*., 91 F.3d 1418, 1422 (11th Cir. 1996) (quoting *Sullivan v. School Bd. of Pinellas County*, 773 F.2d 1182, 1189 (11th Cir. 1985)). These factors are not meant to be dispositive, and the Court must examine the facts of each case to determine if a claim is frivolous. *Sullivan*, *id.*

Here, although the undersigned has recommended that Defendant prevail on its motion for summary judgment because the EEOC could not establish a *prima facie* case of same-sex gender stereotyping and constructive discharge, Defendant has not established that it is entitled to attorney's fees and costs. First, the undersigned notes that the issue of what constitutes same-sex gender stereotyping hostile work environment in the Eleventh Circuit is an "an issue of first impression requiring judicial resolution." *See Christianburg Garment Co.*, 434 U.S. at 422-23.   The Supreme Court, in *Hughes v. Rowe*, 449 U.S. 5 (1980), stated that, "even if the law or the facts are somewhat questionable or unfavorable at the outset of litigation, a party may have an entirely reasonable ground for bringing suit." *Id.* at 15.[35] The individual facts of the

---

[35]     *Hughes* involved an attorney's fee request pursuant to 42 U.S.C. § 1988 in a case brought under 42 U.S.C. § 1981. Although different attorney's fee statutes are involved, since Title VII and § 1981 claims are analyzed identically, *Brown v. Am.*

case must determine if the claim is frivolous. *Sullivan*, 773 F.2d at 1189. The Court

must ask whether plaintiff had any reasonable foundation on which it could reasonably

believe she had a claim. *Id.*

As discussed in detail above, some of Garrison's comments arguably implicated

unlawful gender stereotype hostile work environment harassment. Other statements

were somewhat ambiguous. Presumably Defendant had a better opportunity to make

contact with Garrison in an effort to clear up any ambiguities, but he did not testify by

affidavit, deposition or otherwise. And, while certainly a different judge could have

analyzed this case in less words, the Court is unable to say after the amount of analysis

it had to conduct that the EEOC's case was frivolous although not ultimately

successful.

In addition, there is no evidence in the record, nor does the Defendant argue,

that it attempted to settle this case.[36] Had Defendant attempted to do so following the

close of the discovery period, the filing of a motion for summary judgment may have

_____

*Honda Motor Co., Inc.*, 939 F.2d 946, 949 (11th Cir. 1991), the Court discerns no
reason why a case involving § 1981 attorney's fees is not applicable to this case.

[36]     In their Joint Preliminary Report and Discovery Plan, the parties state that
settlement was discussed at the Rule 26(f) conference on January 8, 2007. [Doc. 7 at
12]. However, there is no indication that settlement attempts were made following the
close of discovery.

been rendered unnecessary.  Based on these facts, Court cannot say that Defendant is entitled to attorney's fees and costs.

Accordingly, the undersigned **RECOMMENDS** that Defendant's request for attorney's fees pursuant to 42 U.S.C. § 2000-5(k) be **DENIED**.

*CONCLUSION*

For the reasons set forth above, the Court **RECOMMENDS** that Defendant's Motion For Summary Judgment, [Doc. 72] be **GRANTED** as to the EEOC's and Jones's federal claims and that Jones's state law claim for intentional infliction of emotional distress be **DISMISSED WITHOUT PREJUDICE**.   The Court also **RECOMMENDS** that Defendant's request for attorney's fees from the EEOC be **DENIED**.

The Clerk is **DIRECTED** to terminate reference to the undersigned.

**IT IS SO RECOMMENDED and DIRECTED**, this the 30th day of July, 2008.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)